UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

In Re Patterson Companies, Inc.
Securities, Derivative & ERISA
Litigation.

Master Case Number:  05cv1757(DSD/JJG)

This Document Relates to: All Actions:
05cv1757(DSD/JJG)
05cv1853(DSD/JJG)
05cv1891(DSD/JJG)
05cv2032(DSD/JJG)
05cv2119(DSD/JJG)(Securities Fraud Actions)
05cv2155(DSD/JJG)(Derivative Action)
05cv2383(DSD/JJG)(ERISA Action)

----------------------------------------------------------------

        This matter is before the court upon defendants' motions to
dismiss the consolidated securities class action complaint; to
dismiss, or in the alternative for summary judgment on, the amended
ERISA class action complaint; and to dismiss the verified amended
shareholder derivative complaint.  In addition, lead plaintiffs in
the consolidated securities action move to strike defendants'
exhibits 2, 4 and 9 presented during oral arguments.  Based upon a
review of the file, record and proceedings herein, and for the
reasons stated, the court denies lead plaintiffs' motion to strike
as moot, grants defendants' motions and dismisses the consolidated
securities class action, the shareholder derivative action and the
ERISA class action.

**BACKGROUND**

Before the court are three actions consolidated for pretrial purposes — a putative consolidated securities fraud class action, a shareholder derivative action and a putative ERISA class action — each of which arose out of the failure of Patterson Companies, Inc., to attain its earnings and revenue projections for fourth quarter 2005 and fiscal year 2005. On the evening of May 24, 2005, Patterson common stock traded at a record high of $53.58 per share. (Consol. Sec. Compl. ¶ 9.) Following the announcement that Patterson missed its fourth quarter and fiscal year 2005 guidance, Patterson common stock traded on record volume of over 10 million shares and dropped approximately 17% in price, resulting in an estimated $1.1 billion loss in market capitalization. Each action before the court is predicated on allegations that Patterson knew prior to May 2005 that the price of Patterson common stock was artificially inflated and the company could not attain its financial guidance, but continued to publicly tout growth and maintain previously issued earnings-per-share projections.

I.    **Factual Background**[1]

Patterson Companies, Inc. ("Patterson"), is a publicly held Minnesota-based distribution company, incorporated in the state of Minnesota.  Throughout the time period relevant to this litigation, Peter L. Frechette was Patterson's Chief Executive Officer ("CEO"); James W. Wiltz was President, Vice President and Chief Operating Officer ("COO"); and R. Stephen Armstrong was Executive Vice President, Treasurer and Chief Financial Officer ("CFO"). Frechette also served as Chairman of the Patterson Board of Directors, comprised of directors Ronald E. Ezerski, David K. Beecken, Ellen A. Rudnick, Andre B. Lacy, Harold C. Slavkin and James W. Wiltz ("Patterson Board").

Patterson currently sells high-end merchandise to retailers and professionals in three markets: North American dental supplies, United States pet and veterinary supplies and worldwide rehabilitative, non-wheelchair assistive products.  Patterson's oldest and largest business, however, is Patterson Dental Supply, which accounted for approximately 76% of its revenues in 2005. Patterson Dental Supply is the largest distributor of dental products in North America and supplies dentists, professionals,

---

[1]    The following facts relevant to all three consolidated actions is based on the allegations contained in the consolidated securities class action complaint and the contents of the public filings with the Securities Exchange Commission referenced therein and attached to the Declaration of Jessica R. Rosenberg.  (See Consol. Sec. Compl. ¶¶ 1-10, 22-47, 50-83; Rosenberg Decl. Exs. 1, 2, 4, 5, 7, 8, 17.)

laboratories and healthcare institutions with an expansive variety of consumable dental supplies, dental equipment, software, educational programs and office supplies.

In the early 2000s, Patterson began to expand through an aggressive growth and acquisition plan and acquired Webster Veterinary Supply in 2001, AbilityOne Products Corp. (rehabilitation supplies) in 2003, ProVet (pet food and supplies) in April 2004, Medco Supply Co., Inc. (medical products) in May 2004, CAESY Education Systems Inc. (dental supplies and equipment) in May 2004 and Milburn Distributions Inc. (equestrian supplies) in October 2004.   In 2004, analysts viewed Patterson as a growth company and it was rewarded by increased stock prices and high price-to-earnings multiples.  In addition to growth by acquisition, Patterson emphasized internal growth initiatives and accomplishments within Patterson Dental Supply.

In January 2004, the company reported that one reason behind an 11.6% rise in dental segment sales was "the positive impact of continued strengthened market focus, new sales training, tools and programs, and the addition of territory sales representatives to the sales force."  (Consol. Sec. Compl. ¶ 27.)  In February 2004, Frechette disclosed a strategy to continue internal growth by motivating the sales force through incentives while contemporaneously hiring and training more field sales personnel, noting the company's sales growth and market share gains

historically correlated with the strength of its sales force.  In April 2004 the company reiterated an intent to continue growth and expand its customer base through continued internal expansion of its sales force and acquisitions of distributors in new markets, believing itself to be "well positioned to take advantage of expected continued consolidation in the dental distribution market." (Id. ¶ 24.)

On August 26, 2004, Patterson released its first quarter fiscal year 2005 earnings and reported that sales of consumable dental supplies and printed office products increased 14%, led by a 15% growth in United States consumables, which equated to a 7% internal sales growth after accounting for an extra week in first quarter 2005.  According to Frechette, all dental consumables sales growth was internally generated and the growth rate of consumable dental supplies had begun accelerating during the third quarter of fiscal year 2004 in response to the strengthened focus that Patterson placed on this portion of its business.  The sales growth was noted by analysts, who reported the company's renewed focus on improvements in, and increased incentives for, its sales force.

On November 24, 2004, Patterson released its second quarter 2005 earnings and reported consolidated sales 21% higher than the year-earlier quarter.  The company reported a 12% sales growth in Patterson Dental Supply, substantially all of which was internally generated.  Patterson predicted third quarter earnings of $0.36 to

$0.37 per diluted share, and maintained its previously issued financial guidance of $1.34 to $1.36 for fiscal year 2005.   On November 24, Patterson common stock traded approximately 3.6% higher and closed at $40.37.   During the company's third quarter 2005, the stock price continued to trend upwards, closing at approximately $44 at the end of December 2004.

On February 24, 2005, Patterson released its third quarter 2005 earnings and reported consolidated sales 22% higher than the year-earlier quarter, with internally generated sales up approximately 15%.   The company reported that Patterson Dental Supply attained an 18% sales growth, substantially all of which was internally generated, and a 10% increase in sales of consumable dental supplies and printed office products.   The company forecasted fourth quarter earnings of $0.38 to $0.40 per diluted share and again maintained its previously issued fiscal year guidance.   The market again reacted favorably.   By March 1, the stock began to trade over $50.00 per share.

On March 30, 2005, Patterson held an institutional investor conference and conveyed a positive financial outlook noting continued demand for dental equipment and forecasting continued growth.   (Id. ¶ 66.)   On May 6, Frechette and Armstrong presented at the Morgan Stanley Global Healthcare Unplugged Conference ("Morgan Stanley Conference") and the company reported that it would continue to deliver solid earnings growth "but that in the

near term current valuations account for much of this potential."
(Id. ¶ 69.)  On May 26, Patterson released its fourth quarter and
fiscal year 2005 earnings and announced that Frechette was stepping
down as CEO.   For fourth quarter 2005, Patterson common stock
earned $0.36 per diluted shared, short of the company's guidance of
$0.38 to $0.40 per diluted share.  For fiscal year 2005, Patterson
common stock earned $1.32 per diluted shared, short of the
company's financial guidance of $1.34 to $1.36.  Despite missing
its guidance, Patterson grew during fiscal year 2005 and reported
an overall increase in net sales both company wide and within
Patterson Dental Supply.  (See Rosenberg Aff. Ex. 7 at 23.)

Patterson reported that its missed earnings were the result of
a combination of business factors, including expenses associated
with personnel incentive programs, increased inventories, that
fourth quarter dental consumables sales were affected by the sale
of a wholesale business and that Canada's dental operation turned
in a relatively weak fourth quarter performance.  At the time it
announced its 2005 earnings, Patterson revised its guidance for
first quarter 2006 to $0.31 to $0.33 per diluted share and for
fiscal year 2006 to $1.54 to $1.58 per diluted share.  Following
the company's earnings announcement, the price of Patterson common
stock dropped and this litigation ensued.

II.   **Procedural Background**

On August 9, 2005, Rosenbaum Capital, LLC, ("Rosenbaum") filed a class action complaint pursuant to Federal Rule of Civil Procedure 23 on behalf of itself and all others who purchased the publicly traded securities of Patterson between November 24, 2004, and May, 25, 2005 (the "securities class period").  Rosenbaum alleged that Patterson and certain of its officers and directors violated § 10(b) and § 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") as well as Rule 10b-5 promulgated thereunder.  By September 13, 2005, similar securities fraud actions alleging substantively identical violations of the Exchange Act were filed by Lemuel John, Teamsters Local 456 Annuity Fund, Philip Katz and Bruce Tuchman.

On September 16, 2005, Vance Cadd, derivatively on behalf of Patterson, filed an action against Patterson in its nominal capacity and various Patterson employees, officers and directors (the "derivative action").  Cadd is a citizen of California who owned Patterson common stock at all times relevant to the derivative action.  Cadd pleaded claims for breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment arising out of conduct that occurred from February 2005 to the present (the "derivative class period"). In addition, Cadd alleged claims of insider trading and misappropriation of information against Frechette, Ezerski and

8

Beecken, as well as Jeffrey H. Webster, president of Webster
Veterinary Supply.

On October 11, 2005, Tamara Dolliver — on behalf of herself,
the Patterson Companies, Inc., Retirement Savings Plan and ESOP
and all participants in, and beneficiaries of, the plan whose
individual accounts held an interest in Patterson common stock
between November 24, 2004, until present (the "ERISA class period")
— filed a class action complaint against Patterson and several of
its officers and directors alleging violations of the Employer
Retirement Income Security Act of 1974 ("ERISA") (the "ERISA
action"). Dolliver is a former participant and beneficiary of the
plan whose individual account included Patterson common stock as an
investment option during the ERISA class period.

On January 20, 2006, the court consolidated the five
securities actions in accordance with Federal Rule of Civil
Procedure 42(a) (the "consolidated securities action"). Pursuant
to the parties' stipulation and the relevant provisions of the
Private Securities Litigation Reform Act (the "PSLRA"), the court
appointed Rosenbaum, John C. Fritzel and City of Hialeah Employees'
Retirement System to serve as lead plaintiffs. See 15 U.S.C.
§ 78u-4. The court further consolidated the derivative action and
the ERISA action for pretrial purposes.

On March 21, 2006, lead plaintiffs filed a consolidated class
action securities complaint ("consolidated securities complaint")

9

against Patterson, Frechette, Wiltz and Ezerski.  Cadd filed a
verified amended shareholder derivative complaint ("amended
derivative complaint") against Patterson in its nominal capacity,
Wiltz, Armstrong, Frechette, Webster, Ezerski, Lacy, Rudnick and
Beecken.  On March 31, Dolliver filed an amended class action
complaint for violations of ERISA ("amended ERISA complaint")
against Patterson, Frechette, Wiltz, Ezerski, Beecken, Webster,
Lacy, Rudnick, Slavkin and Armstrong.

The respective defendants now move to dismiss the consolidated
securities complaint, the amended derivative complaint and the
amended ERISA complaint.

## DISCUSSION

### I.   Standards of Review

Pursuant to Federal Rule of Civil Procedure 12(b)(6), the
court will dismiss a complaint for failing to state a claim upon
which relief may be granted if, after taking all facts alleged in
the complaint as true, it appears beyond doubt that the plaintiff
cannot prove any set of facts that would entitle it to relief.
Alpharma, Inc. v. Pennfield Oil Co., 411 F.3d 934, 937 (8th Cir.
2005).  Dismissal under Rule 12(b)(6) is warranted "in the unusual
case in which a plaintiff includes allegations that show, on the

face of the complaint, that there is some insuperable bar to relief." <u>Strand v. Diversified Collection Serv., Inc.</u>, 380 F.3d 316, 317 (8th Cir. 2004).

When a Rule 12(b)(6) motion presents "matters outside the pleadings," the court treats the motion as one for summary judgment and disposes of it pursuant to Federal Rule of Civil Procedure 56. <u>See</u> Fed. R. Civ. P. 12(b)(6); <u>Blair v. Wills</u>, 420 F.3d 823, 826-27 (2005). Under Rule 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>see also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 252 (1986).

"Matters outside the pleadings" include "any written or oral evidence in support of or in opposition to the pleading that provides some substantiation for and does not merely reiterate what is said in the pleadings." <u>Hamm v. Rhone-Poulenc Rorer Pharm., Inc.</u>, 187 F.3d 941, 948 (8th Cir. 1999) (internal quotations omitted). However, when a complaint relies on undisputed documents the court may consider such documents without converting the motion into one for summary judgment. <u>Silver v. H & R Block, Inc.</u>, 105 F.3d 394, 397 (8th Cir. 1997). Therefore, in addition to the pleadings, in ruling on a motion to dismiss the court may consider

11

materials that are "'embraced by the pleadings'" or "'part of the public record." In re K-tel Int'l Inc., Sec. Litig., 300 F.3d 881, 889 (8th Cir. 2001) (quoting Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir. 1999)); see also In re Xcel Energy, Inc., Sec., Der. & ERISA Litig., 312 F. Supp. 1165, 1178 n.5 (D. Minn. 2004) (consideration of publicly filed plan documents necessary to claims on motion to dismiss ERISA action).  Further, when a party moves to dismiss an action for lack of subject matter jurisdiction the court may consider matters extrinsic to the allegations in the complaint because the court is "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." Osborn v. United States, 918 F.2d 724, 729-30 (8th Cir. 1990) (internal quotations omitted).

## II. Securities Class Action

In the consolidated securities complaint, lead plaintiffs allege that Frechette, Wiltz and Ezerski failed to disclose material adverse information about the status of Patterson's financial condition that rendered statements made during fiscal year 2005 false and misleading in violation of § 10(b) of the Exchange Act and Rule 10b-5.  Plaintiffs also allege that Frechette, Wiltz and Ezerski are liable as "control persons" under § 20(a) of the Exchange Act.

Plaintiffs' § 10(b), Rule 10b-5 and § 20(a) claims are based on the following information alleged to have been omitted from

eight communications during the securities class period: (1) sales of dental consumables and printed office supplies within Patterson Dental Supply were "stagnant"; (2) Patterson was incurring "significant expenses related to the hiring and training of sales staff [and] an incentive program that rewarded low-volume sales personnel who contributed little to the Company's bottom line"; (3) demand for Patterson Dental Supply's "core dental equipment such as chairs, lights and cabinets was declining"; and (4) "defendants knew they could not and would not make" their fourth quarter and fiscal year 2005 earnings projections. (Consol. Sec. Compl. ¶¶ 56, 64, 70.)  As a result of these omissions, plaintiffs allege that the information and earnings projections contained in the following SEC filings and public statements were false and misleading: the second quarter 2005 earnings press release, earnings conference call and Form 10-Q; the third quarter 2005 earnings press release, earnings conference call and Form 10-Q; and statements made during the investor conferences held on March 30 and May 6, 2005.  (Id. ¶¶ 50-53, 57-59, 66-67, 69.)

### A.   Alleged "False and Misleading" Statements

As to the statements relating to second quarter 2005, plaintiffs quote a portion of the second quarter 2005 press release dated November 24, 2004, in which Patterson reported consolidated sales of $578,237,000 — a 21% increase from the year-earlier quarter — and net income of $42,504,000 or $0.31 per diluted share

— a 22% increase from the year-earlier quarter of $34,886,000 or $0.25 per diluted share. (Id. ¶ 50.) During the company's second quarter, AbilityOne had a "significant positive impact on consolidated earnings," while the earnings contributions of more recently acquired ProVet, Medco, CAESY and Milburn Distributions was anticipated to occur during the second half of fiscal year 2005. (Id.) The company further reported that sales within Patterson Dental Supply grew 12% to $438,918,000, substantially all of which was internally generated. (Id.) Sales of dental equipment and software increased 21%, "which included solid contributions from both the U.S. and Canadian dental operations." (Id.) Sales of consumable dental supplies and printed office products increased more than 6%, led by U.S. consumables growth of nearly 7%, that reflected "the effectiveness of efforts over the past year to strengthen this portion of Patterson's business." (Id.) Patterson claimed the sales force of Patterson Dental Supply was the largest in the industry and totaled 1,410. (Id.)

In addition to the above financial statements, the earnings release quoted Frechette as follows:

> The second quarter was another strong period for Patterson. ***Within our dental business, we are encouraged by the solid sales growth of consumable supplies*** and by continued strong demand for both basic equipment and new-generation dental systems [...]. Based on the strong results of our equipment business, it is clear that dental practices are continuing to invest heavily in a wide range of new equipment and software that can strengthen office productivity and improve clinical outcome. Patterson's performance is also benefiting from

our recent acquisitions, which have augmented our growth and strategically bolstered the market positions of our dental, veterinary and rehabilitation supply businesses.

...

***The positive outlook for our three businesses makes us optimistic about Patterson's prospects as we enter the second half of fiscal 2005.  For this year's third quarter ending January 29, 2005, we are forecasting earnings of $0.36 to $0.37 per diluted share.  We also are maintaining our previously-issued financial guidance of $1.34 to $1.36 for the full fiscal year.***

(<u>Id.</u> alteration in original.)  During the November 24, 2004, earnings conference call, Wiltz reported that the dental business was "continuing to perform at high level," and repeated the growth rates and figures contained in the press release for the company, Patterson Dental Supply and the sales of dental consumables and dental equipment.  (<u>Id.</u> ¶ 51.)  According to Wiltz, dental consumables growth was "internally generated" and reflected "the effectiveness of efforts over the past year to strengthen this portion of Patterson Dental's business" and that demand for Patterson dental equipment remained "strong."  (<u>Id.</u>)  During the call, Steve Armstrong stated:

> Looking ahead, we still expect to exceed our internal goal of improving our consolidated gross margin by at least 10 basis points for the full fiscal year ... [W]e are working to strengthen the margins of these new businesses and expect to see the initial positive results of these actions as the year progresses.
>
> ...

15

> [Y]ou know historically that third and fourth quarter are
> generally the stronger quarters in the business, and so
> we can get some natural leverage because of the increased
> sales volume.

(Id. ¶ 52.)  These financial results and earnings projections were reported in Patterson's second quarter 2005 Form 10-Q, which was filed on December 9, 2004.  (Id. ¶ 53.)

On February 24, 2005, Patterson issued its third quarter 2005 earnings press release and reported consolidated sales of $638,005,000 — a 22% increase from the year-earlier quarter — and net income of $50,137,000 or $0.36 per diluted share — a 25% increase from the year-earlier quarter of $40,061,000 or $0.29 per diluted share.  (Id. ¶ 57.)  "Internally generated sales were up approximately 15%."  (Id.)  Patterson Dental Supply experienced an 18% sales growth to $499,796,000, substantially all of which was again internally generated.  (Id.)  Sales of dental consumables and printed office products increased 10%, but one extra day of sales in the quarter accounted for 1-2% of that growth.  (Id.)  The company explained that sales of dental consumables "also benefited from the effectiveness of efforts to strengthen this portion of Patterson's business," and that Patterson Dental Supply's sales force remained the largest in the industry at 1,420.  (Id.)  As in the prior quarter, sales of dental equipment and software rose 30%, "generated by strong demand for both basic and new technology equipment in the U.S. and Canada," while sales of "other services and products" increased 8%.  (Id.)

16

According to Frechette:

> *We are very encouraged by Patterson's strongly improved sales and earnings in this year's third quarter. Virtually every aspect of our dental business is continuing to perform at a high level. Sales of dental consumables registered their highest growth rate in recent years, while demand remains strong for basic equipment and new-generation dental systems, including the CEREC(R)3D dental restorative system, digital radiography and related networking systems.* Dental practices are investing heavily in equipment and software that strengthens office productivity and improves clinical outcomes. As the leading distributor of dental equipment by a considerable margin, Patterson Dental is extremely well positioned to capitalize upon these ongoing investment trends.
>
> *...*
>
> *Patterson is forecasting earnings of $0.38 to $0.40 per diluted share for the fourth quarter of fiscal 2005 ending April 30, which is consistent with the Company's previously-issued financial guidance of $1.34 to $1.36 for the full fiscal year.*

(Id. alteration in original.)   On February 24, 2005, Frechette reiterated the contents of the press release during the earnings conference call.   (Id. ¶ 58.)   Taking into account the extra selling day, Frechette reported that "consumable sales growth was strong."   (Id.)   Frechette went on to say:

> Based on the strong results of our equipment business through the first nine months of fiscal 2005, it remains clear that dental practices are continuing to invest heavily on a wide range of new equipment and software that can strengthen office productivity and improve clinical outcomes.

(Id.)  During the conference call, Wiltz responded to a question
directed to the company's improvement in consumable sales with the
following statement:

> I think two things you'll continue to see.  We started
> last fall with sales meetings in each region for the
> entire sales force.  Those will continue.  And the second
> thing that's going on is also continuing.  We've
> increased the number of trainees that we put through the
> training facility here in St. Paul.  We're now training
> 120 to 130 trainees annually.  With the vast majority of
> those being territory sales reps . . ..  So we're
> actually putting more feet on the street than we were
> previously.  That's part of the impact you're seeing.

(Id. ¶ 59.)  The company's third quarter 2005 Form 10-Q was filed
with the SEC on March 10, 2005. (Id. ¶ 63.)

In addition to the above press releases, earnings conference
calls and SEC filings, plaintiffs allege that at Patterson's
investor conference on March 30 "defendants" gave additional "false
and misleading" information including the publication at the
conference and on the company's website of statements that
Patterson "was experiencing 'strong demand for dental equipment,'
'increased demand for specialty procedures' and a 'growing number
of dentists updating basic equipment.'"    (Id. ¶ 66.)
"Additionally, the investor's conference highlighted the Company's
'consistent earnings growth' and increasing 'operating margins.'"
(Id.)  During the conference "defendants" forecasted continued
growth in Patterson's dental supply segment based on (1) increased
medical sales to seniors, (2) increased consumer spending on dental
care, (3) increased demand for dental equipment and (4) expanded

18

dental insurance coverage in the market.  Plaintiffs allege that defendants thereby "painted a false but rosy picture of the Company's then-current financial status and core business fundamentals."  (Id. ¶ 67.)

Lastly, at the Morgan Stanley Conference, at which Frechette and Armstrong presented, plaintiffs allege that "defendants continued to lie" when they "provided 'incremental support . . . that Patterson should continue to deliver solid earnings growth in the quarters but that in the near term current valuations account for much of this potential.'"  (Id. ¶ 69.)

## B.   Allegations of Fraud

Lead plaintiffs allege that defendants knew the above SEC filings and public statements were false and misleading because defendants were aware, as early as October 2003, that Patterson common stock was artificially inflated and that it was just a matter of time before Wall Street would notice and Patterson's earnings would decline significantly.  (Id. ¶ 30.)  Plaintiffs base that allegation on the following information provided exclusively by confidential informants.[2]

---

[2]   To rely on confidential informants a plaintiff alleging securities fraud need only plead enough information "to support the probability that a person in the position occupied by the source would possess the information alleged." Novak v. Kasaks, 216 F.3d 300, 314 (2d. Cir. 2000); see Fla. State Bd. of Admin. v. Green Tree Fin. Corp., 270 F.3d 645, 668 (8th Cir. 2001).  Lead plaintiffs pleaded sufficient information to support a probability that the confidential informants relied upon and referenced herein
(continued...)

As to the "stagnant" sales of dental consumables, according to a former marketing specialist in Patterson's dental segment division, Patterson senior management consistently warned employees about a slump in the market for dental consumables and printed office products starting in October 2003.  (Id. ¶ 31.)  The only specific facts pleaded to support this "consistent warning" are that the marketing specialist attended a "pep talk" for Patterson Dental Supply's southwest regional sales and marketing employees on October 27, 2003, that approximately six to seven sales managers and seventy sales representatives attended.  (Id.)  At that talk, the president of Patterson Dental Supply, Scott Kabbes, said sales of dental consumables and printed products were "flat and at some point in time Wall Street is going to realize that our stock is overvalued."  (Id.)  According to a former Patterson sales representative, a "slump in sales" was a major topic at a regional sales meeting in Atlanta, Georgia, during the fall of 2004.  (Id.)

The marketing specialist also attended Patterson Dental Supply's September 2004 annual meeting for United States and Canadian sales and marketing representatives in St. Paul, Minnesota, and saw Frechette in the audience.  (Id. ¶ 33.)  According to the marketing specialist, the purpose of the annual meeting was to "re-focus" branch managers to "catch up" with

_____

[2](...continued)
would possess the alleged information.

competition.  (<u>Id.</u>)  At that meeting, Kabbes repeated his warning that sales of dental consumables were flat and said that Patterson needed to grow 9.9% to compete with its closest competitor and that "we know we are suffering, falling way behind, and Wall Street will eventually catch up with us."  (<u>Id.</u>)  According to the market specialist, Patterson's statement on November 24 that the company was "encouraged by the solid sales growth of consumable supplies and by continued strong demand for basic equipment" was surprising and the company's statement in the third quarter 2005 press release that "virtually every aspect of our dental business is continuing to perform at a high level" was false.  (<u>Id.</u> ¶¶ 34, 41.)  Lastly, according to a former merchandise manager, there was a "huge disconnect" between sales of dental equipment and sales of dental consumables and printed office supplies based on the percentage of sales that were occurring through the Patterson Dental catalog. (<u>Id.</u> ¶ 32.)

As to the costs associated with the employee incentive plan, Patterson offered bonuses to its sales personnel that could reach as high as 15% of an employee's salary.  (<u>Id.</u> ¶ 36.)  According to the marketing specialist, the bonus program "created large bonuses for lower volume producing sales representatives who were contributing very little to the company's bottom line."  (<u>Id.</u> ¶ 37.)  According to a former accountant and branch administrator, the company set sales goals every year and rewarded attainment of

those goals with employee bonuses. (Id. ¶ 39.) After the close of third quarter 2005, "management produced a newsletter and sent e-mails ... instructing sales people: 'We need to step up our game, we're behind, we need to push'" and the correspondence identified how much equipment and merchandise was needed to meet the company's forecasts. (Id.) The former accountant claims that Patterson management "obviously knew" it would not make its numbers because management had access to a real-time accounting system and could track company performance. (Id. ¶ 40.)

As to the company's sales of dental equipment, according to a former CEREC territory sales representative, Patterson employees could track sales daily on a website. (Id.) At a February 2004 meeting for Patterson Dental Supply's Southern Illinois region, Kabbes presented a "state of the branches" and told attendees that Patterson Dental Supply "wanted to increase the number of equipment sales specialists." (Id. ¶ 42.) At a branch meeting in October 2004, according to the CEREC representative, Kabbes said that the company's attempt to add territory sales representatives had "horrible" results and the faster the company added them "the quicker they leave." (Id. ¶ 43.) At a February 2005 dental meeting in Chicago, Illinois, a former territory sales representative saw Kabbes deliver a slide presentation that Patterson Dental Supply's sales of core equipment were down, in

part, because competitors were beating the company on the street.
(Id. ¶ 44.)

Based on the foregoing information provided by confidential
informants and generalized allegations that defendants communicated
with each other and Patterson management about the company's status
and were able to monitor sales and earnings on a daily basis,
plaintiffs allege that defendants knew Patterson's reported
financial results and projections were "false and misleading"
because "when the financial impact of these internal problems
became known to the investing public it would have a substantial
negative impact on the price of Patterson's stock." (Id. ¶ 47.)

### C.   Motion to Strike Exhibits

In opposing defendants' motion to dismiss, lead plaintiffs
objected to defendants' submission of documents other than SEC
filings, namely, transcripts of the November 24, 2004, and February
24, 2005, earnings conference calls, as well as charts and graphs
that purport to represent historical stock sales for Frechette,
Ezerski and Wiltz. (See Rosenberg Decl. Exs. 3, 6, 10-12.)
According to defendants, the charts and graphs are based on public
information contained in the respective SEC filings. (See id. Exs.
13-15.) Following oral arguments, plaintiffs also moved to strike
defendants' exhibits 2, 4 and 9 submitted during oral arguments,
each of which summarizes information from the consolidated
securities complaint and various SEC filings.

As to the transcripts, the court has based its analysis of the conference calls on the quotations contained in the consolidated securities complaint. (<u>See</u> Consol. Sec. Compl. ¶¶ 51, 52, 58, 59.) Similarly, in reviewing the respective stock transactions of defendants, the court has considered only the figures contained in each Form 4s.  The court has not relied upon, referenced or cited Rosenberg Declaration exhibits 3, 6, 10, 11 or 12 in ruling on the merits of the motion to dismiss.  Rather, the court has limited its factual inquiry to the allegations contained in the consolidated securities complaint and the information contained in the SEC filings of public record.   Therefore, the court overrules plaintiffs' objection to those exhibits as moot.

As to the demonstrative exhibits provided during oral arguments, none of the exhibits were submitted to the court in an attempt to challenge the veracity of the allegations contained in the consolidated securities complaint or the publicly available information in the SEC filings.  Rather, the exhibits summarize portions of the allegations and SEC filings relevant to defendants' argument.   Again, however, because the court has limited its factual inquiry to the confines of the consolidated securities complaint and the undisputed SEC filings, the court denies plaintiffs' motion to strike as moot.

**D.   Motion to Dismiss § 10(b) and Rule 10b-5 Claims**

To state a securities fraud claim under § 10(b) of the Exchange Act and Rule 10b-5, a plaintiff must plead (1) a misrepresentation or omission of fact that operated as a fraud; (2) scienter; (3) causation, analyzed in terms of reliance and materiality; and (4) economic harm caused when the fraudulent activity occurred in connection with the purchase or sale of a security.[3] <u>In re K-tel Int'l, Inc., Sec. Litig.</u>, 300 F.3d 881, 888 (8th Cir. 2002); 15 U.S.C. § 78(b); 17 C.F.R. § 240.10b-5.

In moving to dismiss the consolidated securities complaint, defendants argue that plaintiffs failed to satisfy the heightened pleading requirements established by Federal Rule of Civil Procedure 9(b) and the PSLRA.  <u>See</u> 15 U.S.C. § 78u-4(b)(1-3). Defendants contend plaintiffs failed to plead with sufficient particularity (1) the alleged misleading statements or omissions and the reasons why each statement is misleading, (2) the specific fraudulent acts committed by each defendant and (3) facts sufficient to give rise to a strong inference of scienter. Alternatively, defendants argue that the § 10(b) and Rule 10b-5 claims should be dismissed under Federal Rule of Civil Procedure

---

[3] Section 10(b) of the Exchange Act, through the promulgation of Rule 10b-5, makes it unlawful "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5.

12(b)(6) because the alleged omissions and statements are not material as a matter of law and are entitled to protection under the PSLRA's safe harbor provision and the bespeaks caution doctrine. Because defendants contend that dismissal of the § 10(b) and Rule 10b-5 claims is warranted, they further move to dismiss the § 20(a) claims on the basis that there can be no secondary liability of the individual defendants as "control persons."

### 1.   The PSLRA's Heightened Pleading Requirements

Under the PSLRA, securities fraud actions are subject to heightened pleading requirements that embody the requirements of Federal Rule of Civil Procedure 9(b). See Kushner v. Beverly Enter., Inc., 317 F.3d 820, 826 (8th Cir. 2003); In re Navarre Corp. Sec. Litig., 299 F.3d 735, 741-42 (8th Cir. 2002) (plaintiff need only satisfy the PSLRA, which "supercedes reliance on 9(b) in securities fraud cases"). First, a plaintiff must plead with specificity each misrepresentation or omission and each statement alleged to have been misleading and the reasons why the statement was misleading. See 15 U.S.C. § 78u-4(b)(1). If a securities fraud allegation is based on "information and belief," the PSLRA further requires a plaintiff to "state with particularity all facts upon which that belief is formed." Id. The circumstances of alleged fraud must be particularly stated so as to include matters such as the time, place and contents of the representations, the identity of the person who made the statement and what he or she

26

obtained or gave up by making the statement — in other words, the "'who, what, when, where, and how.'" K-Tel, 300 F.3d at 890 (quoting Parnes v. Gateway 2000, Inc., 122 F.3d 539, 549-50 (8th Cir. 1997)). Second, with respect to each misrepresentation and omission alleged, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). In other words, plaintiffs must plead "facts or further particularities that, if true, demonstrate that the defendants had access to, or knowledge of, information contradicting their public statements when they were made." K-tel, 300 F.3d at 891.

The heightened pleading standard mandated by the PSLRA serves to "restrain securities fraud litigation abuses such as the practice of pleading by hindsight." Id. at 889. As a result, on a motion to dismiss the court does not accept all allegations to be true, but rather disregards "catch-all or blanket assertions that do not live up to the [PSLRA's] particularity requirements." Fla. State Bd. of Admin. v. Green Tree Fin. Corp., 270 F.3d 645, 660-61 (8th Cir. 2001) (internal quotations omitted). Moreover, although the court typically views all facts in a light most favorable to a plaintiff, securities fraud allegations will not survive a Rule 12(b)(6) motion to dismiss unless the allegations set forth in the complaint "collectively add up to a strong inference of the required state of mind." Id. at 660. "Inferences of scienter do

27

not survive if they are merely reasonable," they must be "both reasonable and 'strong.'"   Id.

### 2.   The Group Pleading Doctrine

The parties dispute whether the group pleading doctrine survived enactment of the PSLRA.  The group pleading doctrine "in its broadest form allows unattributed corporate statements to be charged to one or more individual defendants based solely on their corporate titles" and allows plaintiffs "to rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information are the collective work of those individuals with direct involvement in the everyday business of the company."  Southland Sec. Corp. v. Inspire Ins. Solutions, Inc., 365 F.3d 353, 365-66 (5th Cir. 2004) (internal quotations omitted); see also Wool v. Tandem Computers Inc., 818 F.2d 1433, 1440 (9th Cir. 1987).  Under the common law doctrine, plaintiffs are not required to plead particular facts connecting an individual defendant to the alleged fraud, such as that the defendant made, authored or in fact approved an offending misrepresentation, omission or misleading statement.  Southland, 365 F.3d at 365-66 (collecting cases).

In Southland, the Fifth Circuit rejected the group pleading doctrine in multi-defendant securities fraud actions based on the plain language of the PSLRA's requirement that each fraudulent "'act or omission'" and the facts giving "'rise to a strong

28

inference'" of scienter be particularly pleaded as to "'the defendant.'"  Id. at 364-65 (quoting 15 U.S.C. § 78u-4(b)); see also Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.3d 588, 602-03 (7th Cir. 2006); Phillips v. Scientific-Atlanta, Inc., 374 F.3d 1015, 1018 (11th Cir. 2004).  The PSLRA's reference to "'the defendant' may only reasonably be understood to mean 'each defendant' in multiple defendant cases, as it is inconceivable that Congress intended liability of any defendants to depend on whether they were all sued in a single action or were each sued alone in several separate actions." Southland, 365 F.3d at 364-65; see also Makor Issues & Rights, 437 F.3d at 602-03 (group pleading does not comport with plain language of the PSLRA); Phillips, 374 F.3d at 1018 ("[T]he most plausible reading in light of congressional intent is that a plaintiff, to proceed beyond the pleading stage, must allege facts sufficiently demonstrating each defendant's state of mind regarding his or her alleged violations.")  This rationale is consistent with precedent of the Eighth Circuit Court of Appeals.  See, e.g., Kushner, 317 F.3d at 827 (blanket assertions collectively referencing "the defendants" absent allegations of particular facts as to which defendant was responsible for which statement or how a defendant participated in the alleged scheme constitute "rote allegations" that fail the heightened pleading standards of the PSLRA).

29

To presume a corporate officer or director is connected with fraud based on status — title, duties, or service on a particular committee — is not reconcilable with the PSLRA's particularity mandate.  In determining whether the consolidated securities complaint is entitled to proceed to discovery, the court will apply the PSLRA's particularity pleading requirements to ascertain whether plaintiffs have sufficiently pleaded a claim for securities fraud against each defendant. Cf. Southland, 365 F.3d at 365. Further, although the court will aggregate the allegations to determine whether they suffice to create an inference of scienter, that inference must be created as to each individual defendant. See Makor Issues & Rights, 437 F.3d at 603; Green Tree, 270 F.3d at 660 (allegations of scienter may be considered collectively).

### a.   Particularity

Defendants first challenge the particularity with which plaintiffs have pleaded the violations of § 10(b).  See 15 U.S.C. § 78u-4(b)(1).  Defendants argue plaintiffs failed to sufficiently plead (1) each omission and resultant misleading statement, (2) the reasons why each statement is misleading and (3) the nexus between each individual defendant and the misleading statements.  As a threshold matter, lead plaintiffs adequately pleaded the alleged omissions that form the basis of this action.  (See Consol. Sec. Compl. ¶¶ 47, 56, 64, 70.)  Plaintiffs further sufficiently pleaded

30

the facts upon which they base their belief of the omitted facts. (See id. ¶¶ 30-49.)

However, the only statements pleaded with any particularity are those identified in the second and third quarter press releases and conference calls. As to the second and third quarter Forms 10-Q, the only portions of the SEC filings identified, referenced or cited with any particularity are the CEO certifications. (Id. ¶¶ 53, 63, 65.) Plaintiffs do not identify which statements attested thereby to be true by Frechette in either SEC filing were false or misleading at the time the forms were filed with the SEC. Such generalized allegations do not comport with notions of particularity. The court will not review the SEC filings to divine which statements contained therein could plausibly be deemed misleading. At most, plaintiffs allege that the Forms 10-Q announced and repeated the financial results presented in the respective press releases and conference calls. (Id. ¶¶ 53, 63.) Therefore, the court limits the remainder of its analysis to the portions of the SEC filings that repeat the financial data, projections and public statements contained in the press releases and conference calls and identified in the complaint. Cf. In re Synovis Life Techs., Inc., Sec. Litig., No. 04cv3008, 2005 WL 2063870, at *4 (D. Minn. Aug. 25, 2005) (limiting analysis to bolded and italicized segments of block quotes and those statements refined or identified by parties in briefing).

31

However, the statements made at the two conferences in March and May, 2005, are devoid of the particularity required by the PSLRA.  (<u>See</u> Consol. Sec. Compl. ¶¶ 67-69.)  As to the March 30 statements by "defendants," plaintiffs do not provide any specifics of the information conveyed, the context of the information conveyed or who made the statements.  The words quoted in paragraphs 66 and 67 are unattributed, conclusory quotations of growth expectations made by an unidentified individual at an investor conference and a vague, unidentified growth forecast by "defendants."  As to the May 6 statements, plaintiffs allege only that "defendants provided 'incremental support ... that Patterson should continue to deliver solid earnings growth in the quarters but that in the near term current valuations account for much of this potential.'"  Again, critically missing is the identity of the speaker, the source of the quotation and the context in which the statement was made.  (<u>Id.</u> ¶ 69.)  Plaintiffs' § 10(b) and Rule 10b-5 claims based on the statements made at either conference fail for lack of particularity and are subject to dismissal on that basis.

As to the statements in the press releases, earnings conference calls, and to the extent the content of those statements is recited in the SEC filings, plaintiffs must further specify "the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1).  Whether plaintiffs particularly pleaded the falsity or misleading nature of the statements is a distinct inquiry from

whether they adequately pleaded the omissions and statements. Assuming for the sake of argument that each "fact" omitted was true and attributing each statement to each defendant, plaintiffs fail to identify how or why the omitted facts rendered the statements "false and misleading" at the time they were made.

The statements that form the basis of this litigation are, in sum, reported and projected earnings and statements regarding sustained and expected growth. As to each communication, plaintiffs merely reiterate the alleged omissions and fail to plead facts that might render the affirmative statements "false and misleading" at the time they were made. (Consol. Sec. Compl. ¶¶ 56, 64.) The only "facts" particularly pleaded with respect to any statement are the favorable responses of analysts and the market to the information disclosed and the resultant increase in the value of Patterson common stock. (Id. ¶¶ 54-55, 60-62, 68, 71.) Plaintiffs pleaded no facts to infer that the reported increases in net income, earnings-per-share and sales growth in the second and third quarters 2005 were false. None of the company's earnings during the putative class period have been restated. Patterson grew each quarter in fiscal year 2005 and reported an overall net sales increase for the company as a whole and within Patterson Dental Supply. (See Rosenberg Aff. Ex. 7 at 23.)

As to the sales of dental consumables, plaintiffs' allegations of stagnant growth are contradicted by the internally generated

33

growth during each quarter of fiscal year 2005. At most, the allegations establish an opinion held by the president of Patterson Dental Supply and expressed during sales meetings to motivate a sales force, but shed no light as to whether defendants shared such a viewpoint or "whether the forecasts were necessarily unattainable" as a result of sluggish sales. In re Cerner Corp. Sec. Litig., 425 F.3d 1079, 1086 (8th Cir. 2005).

Neither do plaintiffs articulate or quantify a decrease in demand for consumables or core dental equipment that would have caused the challenged statements to be false or misleading when made. To buttress the scant factual allegations, plaintiffs quote the company's first quarter 2006 earnings release that the company's performance was "affected by the below-plan sales growth of [its] basic dental equipment, including chairs lights and units." (Id. ¶ 79.) The company had experienced such "quarterly fluctuations in the past" and Wiltz emphasized that "sales of dental equipment could be uneven between quarters, reflecting the long lead times generally involved with these significant capital expenditures." (Id. ¶¶ 79, 80, 82.) Reliance on the company's first quarter 2006 statements to allege that Patterson knew its fiscal year 2005 earnings projections were unattainable is the very essence of pleading fraud by hindsight the PSLRA is designed to prevent. Moreover, "allegations that statements in one report

34

should have been made in earlier reports do not make out a claim of securities fraud." <u>K-tel</u>, 300 F.3d at 891.

As to the incentives, plaintiffs do not quantify the number or percentage of employees receiving such incentives, how the incentives were calculated or rewarded, the time period during which the incentives were rewarded, how such incentives correlated with the company's increase in its sales force to spur internal growth or, significantly, how such incentives necessarily rendered the company as a whole unable to make its numbers.   Further, plaintiffs pleaded no facts to support their allegation that only "low-volume sales personnel who contributed little to the company's bottom line" received the incentives.

Lastly, as to Patterson's ability to make its fourth quarter and fiscal year 2005 earnings projections, plaintiffs have failed to sufficiently identify how the alleged downturn in its dental segment division would have necessitated a modification of the company's projected growth and earnings.   Patterson attained both internal and market financial guidance and growth projections for the second and third quarter of 2005.   The information provided by the confidential informants portrays Patterson Dental Supply as pushing hard to attain sales goals and effectively compete.   The allegations paint a negative picture of the ability of Patterson Dental Supply to maintain its rate of growth in the areas of dental consumables and core dental equipment.   The crux of plaintiffs'

allegations of securities fraud is not that Patterson and Patterson
Dental Supply were not growing, but that neither the company nor
its largest division were growing at the rate hoped by Patterson
executives and expected by the market.

As well stated recently by the Eighth Circuit Court of
Appeals:

> The complaint is devoid ... of any indication that this
> alleged loss of deals, even if "material," is necessarily
> inconsistent with [the company's] statements that its
> demand was "strong."  A company could conceivably lose a
> material number of deals it had pursued, and yet continue
> to see a strong demand for its products and substantial
> future opportunities.  Furthermore, there is no
> indication on the face of the complaint that even a
> material loss of deals necessarily rendered [the company]
> unable to achieve its projected earnings.  . . . Without
> any indication that an undefined loss of sales
> necessarily would affect the company's overall demand or
> its ability to meet its future earnings projections,
> these allegations cannot survive the [PSLRA's] falsity
> standard.

Cerner, 425 F.3d at 1084 (statements regarding future earnings were
not materially false and misleading based on omitted facts that
included loss of deals, increased competition, dissatisfied
customers, economic downturn and an inexperienced sales force).
Misguided corporate strategy, or internal strategies that do not
come to fruition, do not equate to securities fraud.

Moreover, there is nothing inherently improper in motivating
a sales force to stay competitive and strive to reach sales goals
to prevent a market backlash for missed numbers.  Cf. Greebel v.
FTP Software, Inc., 194 F.3d 185, 202 (1st Cir. 1999).  Patterson

missed its earnings projections and the market undeniably reacted. The resultant $1.1 billion loss in market capitalization was far from trivial.   However, plaintiffs' attempt to contort missed earnings into actionable securities fraud with the benefit of hindsight based on motivational sales talks and the company's maintenance of previously issued growth and earnings projections fails to state with particularity an actionable claim for securities fraud under the Exchange Act.

Assuming all plaintiffs' allegations to be true, they do not demonstrate with particularity how the challenged statements regarding Patterson's reported earnings and prospects for fourth quarter and fiscal year 2005 were false or misleading at the time the statements were made.   The only specific connection between any of the individual defendants to the allegations of securities fraud is that Frechette was in attendance at one sales meeting where Kabbes voiced his concern to a portion of the company's sales force.   Plaintiffs have not sufficiently pleaded the "who, what, when, where, and how" of an alleged fraud against any defendant. K-Tel, 300 F.3d at 890.  Plaintiffs' allegations fall substantially short of the PSLRA's particularity requirements.   See 15 U.S.C. § 78u-4(b)(1).   Therefore, dismissal with prejudice of plaintiffs' § 10(b) and Rule 10b-5 claims is warranted.

### b.   Scienter

Even if lead plaintiffs' allegations of securities fraud satisfied the PSLRA's particularity requirement, plaintiffs nonetheless fail to sufficiently plead scienter, that is, an "intent to deceive, manipulate, or defraud." Green Tree, 270 F.3d at 653.  The court looks to various "badges of fraud" to determine whether a complaint adequately pleads scienter. Navarre, 299 F.3d at 745.  Plaintiffs argue they pleaded facts giving rise to a "reasonable and strong" inference of scienter based on (1) the reckless nature of the omissions, (2) defendants' heightened motive and opportunity to engage in fraud and (3) defendants' unusual trading activity during the putative class period.  The court disagrees.

### (1)   Recklessness

Allegations of reckless conduct can give rise to a strong inference of scienter. See K-tel, 300 F.3d at 893-94; Kushner, 317 F.3d at 827.  Recklessness, in the context of securities fraud, refers to "highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." Green Tree, 270 F.3d at 654.  A classic

fact pattern of recklessness depicts defendants publishing statements "when they knew facts or had access to information suggesting that their public statements were materially inaccurate." Id. at 665. However, corporate officials are not required to be clairvoyant and are responsible only for revealing the material facts reasonably available to them. Navarre, 299 F.3d at 743. Moreover, to the extent a complaint is based on forward-looking statements and opinions, the requisite state of mind is actual knowledge. Kushner, 317 F.3d at 831.

Plaintiffs' general allegations of scienter are based on (1) the company's use of a real-time sales and accounting system and the occurrence of routine conferences, reports and updates among management, Kabbes and the vice president of marketing; (2) routine communication of sales goals to employees; (3) statements made by Kabbes at sales and marketing meetings; (4) Kabbes reporting directly to Frechette; and (5) defendants' presumed knowledge of issues central to the company's operations as a result of their respective positions.

The consolidated securities complaint is replete with blanket assertions of knowledge that do not particularly state facts upon which such knowledge was based or increase the reasonableness or strength of an inference that any defendant acted with an intent to defraud the market. The confidential informants establish that, at most, an internal concern by Kabbes about Patterson Dental Supply's

sales growth and ability to compete was discussed at sales and marketing meetings.  The only allegations particular to knowledge of the specific omissions involved in this case relate to Frechette.  Plaintiffs pleaded no particular facts of an intent to deceive as to Wiltz and Ezerski other than their managerial roles and familiarity with the company.  However, defendants' respective positions within the company prove "nothing about fraud or knowledge thereof" but rather are exactly the type of generalized allegations "the court must disregard under the PSLRA." In re Xcel Energy, Inc., Sec., Der. & ERISA Litig., 286 F. Supp. 2d 1047, 1062 (D. Minn. 2003); see also In re Nash Finch Co. Sec. Litig., 323 F. Supp. 2d 956, 962 (D. Minn. 2004).  Taking all plaintiffs' allegations as true, they fail to demonstrate that any of the defendants "made unreasonable statements and the danger of misleading investors was so obvious that they must have been aware of it." Kushner, 317 F.3d 820.  Therefore, plaintiffs have failed to plead a reasonable and strong inference of scienter based on recklessness.

### (2)  Motive and Opportunity

Allegations of a motive generally possessed by all corporate officers and directors, such as a desire to appear profitable or keep stock prices high to increase compensation, are insufficient as a matter of law to satisfy the requirements of the PSLRA.  K-tel, 300 F.3d at 894-95; Green Tree, 270 F.3d at 660.  Allegations

that "defendants misrepresented corporate performance in order to keep stock prices inflated while selling stock" can be sufficient, but plaintiffs must identify a "concrete and personal benefit to the individual defendants." K-tel, 300 F.3d at 894.  The only alleged "motive" in this case is the defendants' desire to increase the value of Patterson common stock, a motive "universally held among corporations and their executives." Green Tree, 270 F.3d at 664; Cerner, 425 F.3d at 1085.  However, any concrete benefit defendants received during the putative class period as a result of their respective stock sales, for the reasons discussed below, does not suffice to establish a reasonable and strong inference of an intent to defraud the market.

### (3) Insider Trading

Allegations of insider trading can give rise to a strong inference of scienter only if "unusual" in light of factors such as the timing, profit made, amount traded, portion of stockholdings retained and number of insiders involved. Navarre, 299 F.3d at 747; Green Tree, 270 F.3d at 659-60.  During the securities class period, the price of Patterson common stock steadily increased from approximately $38.98 to $53.58.  Frechette, Wiltz and Ezerski sold $8,938,148, $4,628,250 and $37,541,321 in Patterson common stock respectively. (Consol. Sec. Compl. ¶¶ 6, 48-49.)  Plaintiffs argue that defendants' respective stock transactions during the securities class period were unusual in timing, magnitude and

profitability, thereby creating a strong inference of scienter. The court disagrees.

Plaintiffs exacerbate defendants' stock transactions by emphasizing the aggregate value of stock traded by defendants collectively during the putative class period, which exceeded $51 million.[4]  Plaintiffs further emphasize that the defendants' proceeds from their respective stock transactions were unusually profitable, dwarfed the compensation they earned in salary and bonuses and were not made in accordance with the PSLRA's safe harbor for executive stock sales.  See 17 C.F.R. § 240.10b5-1. However, plaintiffs strategically limit their pleadings to a comparison of defendants' trades during the securities class period with the nine-month time period preceding the class period, during which the only transaction was a sale of 36,000 shares by Ezerski in September 2004.  (See Consol. Sec. Compl. ¶¶ 48, 49.)

Absent from the consolidated securities complaint are each individual defendant's history of trading Patterson common stock, the rate of accumulation of that stock over the years and the quantity of stock they retained during and following the class period.  According to each individual defendant's Form 4s,

---

[4]  Individually, Wiltz sold 110,000 shares on December 2 and 3, 2004, worth $4,628,250; Frechette sold 100,000 shares on December 7, 8 and 9 of 2004 worth $4,158,550 and 94,274 shares between March 2 and 8, 2005, worth $4,779,598, for a total of 194,274 shares valued at $8,938,148 and Ezerski sold 484,312 shares on March 9, 2005, valued at $24,263,696 and 262,600 shares in April and May 2005 valued at $13,277,625. (See Consol. Sec. Compl. ¶ 48.)

following the securities class period Frechette retained over 97%
of his stock, Wiltz retained over 89% of his stock and Ezerski
retained 77% of his stock.  (See Rosenberg Aff. Exs. 10-12.)  The
court will not limit its review of defendants' history of stock
transactions for purposes of evaluating allegations of scienter to
a narrowly chosen window of time immediately preceding the putative
class period.

Upon a review of the respective SEC filings, defendants'
trading activity during the putative class period was not
"dramatically out of line with prior trading practices at times
calculated to maximize the personal benefit from undisclosed inside
information." Navarre, 299 F.3d at 747.  Although the cumulative
sum was large, plaintiffs have not established that the trading was
"out of the ordinary or suspicious" when compared to defendants'
stock transactions throughout their lengthy employment and
connection with Patterson.  K-tel, 300 F.3d at 846 (internal
quotations omitted).  Therefore, plaintiffs have not pleaded facts
that give rise to a "reasonable and strong" inference of scienter
based on insider trading.

For all these reasons, plaintiffs fail to particularly plead
facts that give rise to a "reasonable and strong" inference that
defendants intended to deceive, manipulate and defraud the
investing public.  Therefore, even if plaintiffs satisfied the
particularity requirements for pleading fraud, dismissal with

43

prejudice would also be warranted for failure to plead scienter, a requisite element of a securities fraud claim.

### 3.   Materiality[5]

An alleged violation of § 10(b) based on omissions of fact or misrepresentations that are immaterial presents "an insuperable bar to relief" warranting dismissal under Rule 12(b)(6).  In re Amdocs Ltd. Sec. Litig., 390 F.3d 542, 547 (8th Cir. 2004) (per curiam). A fact is material if there is a substantial likelihood that its disclosure "'would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'"  Parnes, 122 F.3d at 546 (quoting Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988)).  Materiality is generally a question of fact dependent upon the "particular circumstances of the company in question."  Gebhardt v. ConAgra Foods, Inc., 335 F.3d 824, 829 (8th Cir. 2004).   However, materiality can be determined as a matter of law if the information omitted was (1) so insignificant compared to the total amount of information available to investors that it would not have mattered, (2) "vague and of such obvious hyperbole" that no reasonable investor would rely on it or (3) adequately accompanied by cautionary statements.  Amdocs, 390 F.3d at 548.

---

[5]  The heightened pleading requirements of the PSLRA do not apply to the element of materiality.  Gebhardt v. ConAgra Foods, Inc., 335 F.3d 824, 830 n.3 (8th Cir. 2004).

Because the court has concluded that dismissal is warranted based on the PSLRA's pleading requirements, the court declines to reach the issue of whether the alleged omissions were material. However, the statements made at the investor conferences are the very type of soft puffing statements that "generally lack materiality because the market price of a share is not inflated by vague statements predicting growth." Parnes, 122 F.3d at 548. Moreover, the court finds that "no reasonable investor would rely on these statements and they are certainly not specific enough to perpetrate a fraud on the market." Id.; see also Amdocs, 390 F.3d at 546-48. Therefore, those statements cannot form the basis for liability under the Exchange Act even if the consolidated securities complaint was not subject to dismissal under the PSLRA's pleading requirements.

Further, under the PSLRA's safe harbor, forward-looking statements cannot form the basis for liability under the Exchange Act if accompanied by meaningful risk disclosures or if not made with actual knowledge of falsity. See 15 U.S.C. § 78u-5(c)(1-2); Cf. Parnes, 122 F.3d at 548 (discussing adequacy of cautionary statements under bespeaks caution doctrine). The majority of the statements in the press releases, earnings conference calls and SEC filings are historical or then-current financial conditions not afforded the protection of the safe harbor. However, the statements relating to the company's projections regarding internal

45

growth and earnings-per-share for fourth quarter and fiscal year 2005 were forward-looking statements sufficiently accompanied by cautionary language to be protected by the PSLRA's safe harbor. Therefore, those statements are protected under the PSLRA's safe harbor and cannot form the basis for liability under the Exchange Act.

### E.    Section 20(a) Claims

Under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), derivative liability for violations of § 10(b) and Rule 10b-5 is extended to individuals deemed to be "control persons." See Xcel Energy, 286 F. Supp. 2d at 1059; Vohs v. Miller, 323 F. Supp. 2d 965, 973 (D. Minn. 2004). Because liability under § 20(a) is contingent upon a well-pleaded predicate violation of § 10b and Rule 10b-5, lead plaintiffs have not sufficiently pleaded a violation of § 20(a) against any of the individual defendants for all the reasons above stated. Therefore, those claims are also dismissed.

### F.    Conclusion

Having applied the requisite "stringent" review to the consolidated securities complaint, Parnes, 122 F.3d at 545-46, the allegations contained therein, collectively or in isolation, do not establish actionable claims of securities fraud against any of the defendants. Therefore, the court grants defendants' motion and dismisses the consolidated securities complaint with prejudice.

46

### III.   Shareholder Derivative Action

Cadd commenced the derivative action on behalf of Patterson without first making a demand on the Patterson Board to commence litigation. Cadd named as defendants six of the seven members of the Patterson Board during fiscal year 2005 — Frechette, Wiltz, Ezerski, Lacy, Rudnick and Beecken — as well as Armstrong and Webster. Against all defendants, Cadd asserts claims for breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment. (V. Am. Der. Compl. ¶¶ 1, 92-114.) Cadd further asserts a breach of fiduciary duty claim based on insider trading and misappropriation of information against Frechette, Webster, Ezerski and Beecken. (Id. ¶¶ 24, 79-80, 87-91.)

The factual basis underlying the claims in the derivative action substantially mirrors the allegations that gave rise to the consolidated securities action. Cadd alleges that defendants allowed Patterson to issue false and misleading statements regarding the ability of Patterson Dental Supply to sustain growth rates and internally generate sales and the ability of the company to attain its financial guidance and projected earnings for fiscal year 2005. According to Cadd, defendants in their fiduciary capacities had a duty to prevent or correct the dissemination of improper information. Specifically, Cadd alleges that each defendant owed Patterson, among other things, a duty to insure that

47

Patterson's public statements fairly presented all material information regarding the company's ability to integrate its acquisitions, manage its divisions and make projected earnings. (Id. ¶¶ 52-66.)  As a result of each defendant's respective position with Patterson, Cadd alleges defendants must have known and understood all information material to company performance. (Id. ¶¶ 16-32, 52.)

The various claims for breach of fiduciary duty are premised on statements made in the following communications by Patterson: the second quarter 2005 earnings press release issued November 24, 2004; the earnings conference call conducted by Armstrong and Wiltz on November 24; the company's third quarter earnings press release issued on February 24, 2005; statements by Frechette and Wiltz made during Patterson's institutional investor conference on March 30, 2005; and statements by Frechette and Armstrong during the Morgan Stanley Conference.  (Id. ¶¶ 53-54, 56, 62-63, 65.)  According to Cadd, defendants permitted the company to boast growth rates and earning potentials while concealing that Patterson was not performing up to internal expectations.  (Id. ¶¶ 55, 57-58, 59-61, 64.)  Cadd alleges that defendants, as a result of their respective positions, knew the statements made were "false and misleading" yet permitted the statements to be made.  (Id. ¶¶ 7-9, 16-24, 27, 43-47.)  Cadd further alleges that defendants, each aiding and abetting the other, conspired to deceive the investing public by

48

concealing that the price of Patterson common stock was artificially inflated to maintain their "profits, power and prestige." (Id. ¶¶ 33-38.)

The information defendants allegedly permitted Patterson to omit from the above public communications is as follows: (1) Patterson's dental services division was in a "state of decline which would result in severely constricted earnings growth," (2) demand for dental consumables and printed office products was in a "state of decline and allegedly projected to plummet," (3) the company was incurring incentive-based compensation expenses related "to an undisclosed increase in the number of sales staff used to attempt to jump-start the company's declining sales," (4) Canadian dental operations were "experiencing significant operational difficulties" that included a sharp decline in dental equipment sales and (5) projections for fourth quarter 2005 earnings growth were grossly inflated. (Id. ¶ 78.) As a result of these omissions, Cadd alleges that defendants' "false and misleading statements had the intended effect and caused Patterson stock to continue to trade at artificially inflated levels." (Id. ¶ 66.)

On May 26, 2005 — the date Patterson common stock dropped in price — the Patterson Board was comprised of the six director defendants and Harold C. Slavkin. When Cadd filed the original complaint, the Patterson Board was comprised of defendants Ezerski, Frechette, Lacy, Rudnick, Wiltz and Slavkin — Beecken had stepped

49

down as a director.   During the time period relative to the
derivative action, Ezerski, Lacy and Beecken were members of the
Patterson Board's audit committee and Ezerski, Rudnick and Slavkin
were members of the Board's compensation committee.   (Id. ¶¶ 49-
51.)   Ezerski, Lacy, Rudnick, Beecken and Slavkin were all outside
directors.

Defendants argue that dismissal is warranted because Cadd did
not make a pre-suit demand on the Patterson Board and did not plead
with particularity facts establishing that such a demand would have
been futile as required by Federal Rule of Civil Procedure 23.1.
Defendants also argue that Cadd failed to plead a claim for which
relief can be granted under Rule 12(b)(6) based on the exculpatory
provision in Patterson's Articles of Incorporation that limits
personal liability of directors and, alternatively, failed to
satisfy the heightened pleading requirements for allegations of
fraud under Rule 9(b).   Because the court finds demand on the
Patterson Board would not have been futile, the court does not
address the other issues raised in defendants' motion to dismiss.

### A.   Demand Futility

It is undisputed that Cadd did not make a demand on the
Patterson Board prior to commencing suit.   Pursuant to Federal Rule
of Civil Procedure 23.1, a plaintiff commencing litigation
derivatively on behalf of a corporation must allege "with
particularity the efforts, if any, made by the plaintiff to obtain

the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort."   Although compliance with the pleading requirements of Rule 23.1 is a matter of federal procedural law, because Patterson is a Minnesota corporation the substantive law of Minnesota governs  whether demand would have been futile.  Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 108-09 (1991); Reimel v. MacFarlane, 9 F. Supp. 2d 1062, 1066 (D. Minn. 1998).

Derivative suits are commenced on behalf of a corporation to compensate the corporation for injuries incurred.  Janssen v. Best & Flanagan, 662 N.W.2d 876, 882 (Minn. 2003); Wessin v. Archives Corp., 592 N.W.2d 460, 464 (Minn. Ct. App. 1999).  A decision to pursue claims on behalf of a company necessarily involves "the weighing and balancing of legal, ethical, commercial, promotional, public relations, fiscal and other factors familiar to the resolution of many if not most corporate problems."  Janssen, 662 N.W.2d at 883.  The potential benefit to be obtained by a derivative action must be weighed against "the possibility that disgruntled shareholders will bring nuisance lawsuits with little merit and that even legitimate suits may not be worth pursuing when the likelihood of victory is compared with the time, money, and hostility necessary to win."  Id.  The careful balancing of such factors "is best done by the board of directors, which is familiar

51

with the appropriate weight to attribute to each factor given the company's product and history." Id.

Under Minnesota law, a shareholder must make a demand for relief to a company's board of directors before filing a derivative action on the company's behalf. See Winter v. Farmers Educ. & Coop. Union of Am., 107 N.W.2d 226, 233 (Minn. 1961); see also Reimel, 9 F. Supp. 2d at 1065-66. The demand requirement is excused only upon a showing that "it is plain from the circumstances that [demand] would be futile." Winter, 107 N.W.2d at 234. A derivative suit is available to a shareholder strictly as an "extraordinary remedy" when there is "no other road to redress." Id. at 233. As a condition precedent to filing suit, the demand requirement "is one not lightly to be dispensed with" because it provides corporate management "an opportunity to consider the merits of the dispute and to determine, in the interests of the corporation and shareholders, whether it might be disposed of without the expense and delay of litigation." Id.

Because shareholder derivative actions are not common in Minnesota, and the Minnesota Supreme Court has not revisited the standard governing futility since Winter, this court has looked to the demand futility analyses established by the Delaware courts for guidance. See In re Xcel Energy, Inc., Sec. Litig., 222 F.R.D. 603, 606 (D. Minn. 2004) (citing Janssen, 662 N.W.2d at 883 and collecting cases). Compare Aronson v. Lewis, 473 A.2d 805, 814

(Del. 1984) (demand futile if reasonable doubt exists whether majority of directors were disinterested or able to act independently or it is doubtful that transaction objected to was a product of business judgment) with Rales v. Blasband, 634 A.2d 927, 933-34 (Del. 1993) (if inaction by board is not result of conscious decision, demand futile if majority had disqualifying interest or were unable to act independently).  In the absence of allegations that a majority of the directors acted in concert, this court has previously looked to the Rales demand futility standard and held that the "critical question is whether plaintiff has shown that the board was somehow so conflicted that it could not have properly responded to a demand that it address the allegations of mismanagement and wrongdoing."  Xcel, 222 F.R.D. at 608.  However, Minnesota courts have yet to expressly adopt Delaware law as it relates to demand futility.  Therefore, a determination of demand futility under Minnesota law remains a mixed question of law and fact based on the particular circumstances of the case and in light of the principles enunciated in Winter.  See Xcel, 222 F.R.D. at 606 (quoting Prof'l Man. Assocs., Inc. v. Coss, 598 N.W.2d 406, 410 (Minn. Ct. App. 1999)); Reimel, 9 F. Supp. 2d at 1067 (court will not blindly adopt Delaware law if futility not "plain from the circumstances" and application of Delaware law to facts of case would contravene teaching of Winter).

B.   **Demand Futility Allegations**

Cadd asserts that demand on the Patterson Board would have been futile because of: (1) Frechette and Ezerski's management positions with the company, knowledge of the undisclosed information, personal financial gains and potential liability as a result of the breach of their fiduciary duties and insider trading; (2) Frechette and Wiltz's employment with Patterson was their principal professional occupation and their compensation and benefits were in part tied to the company attaining net income and earnings-per-share goals; (3) Ezerski, Lacy and Beecken's service on the audit committee; (4) Ezerski, Rudnick and Slavkin's roles on the compensation committees and resultant control over the compensation and bonuses of Frechette, Wiltz, Lacy and the non-employee directors; (5) Ezerski's "unique" financial expertise and history with the company; (6) the alleged participation by defendant directors of the Patterson Board in the wrongful conduct; and (7) the business, professional and personal relationships and debilitating conflicts of interest among the various members of the Patterson Board.  (V. Am. Der. Compl. ¶ 84.)

In moving to dismiss, defendants argue that Cadd asserts no more than boilerplate allegations of wrongdoing by defendants and generic allegations of futility that could be pleaded against any board of directors in a shareholder derivative action.  The court agrees.  Allegations that a board of directors was involved in the

54

wrongdoing and that certain directors served on audit and compensation committees, are dependent on the company for their livelihood and have professional and personal relationships are generic and could be alleged against any board of directors in the majority of shareholder derivative suits filed. See Haberle v. Baker, No. 05cv315, 2005 WL 2105543 at *3 (D. Minn. Aug. 30, 2005) (generic allegations of director misconduct and director interconnectedness do not suffice to excuse demand).

Plaintiff argues that under Minnesota law demand is excused whenever the alleged "wrongdoers constitute a majority of the board." Winter, 107 N.W.2d at 233. However, this court has refused to adopt such a per se futility rule under Minnesota law and rejected, as inconsistent with the teaching of Winter, the proposition that demand is automatically futile when a majority of the board is alleged to be involved in the wrongdoing. Reimel, 9 F. Supp. 2d at 1066. Rather, Winter "indicates that demand is excused only if there is no possibility that it could lead to a resolution and suggests that a court should analyze the particular circumstances of the case before it in making a futility determination." Id. A pre-suit demand serves purposes other than forcing a board of directors to sue itself, such as resolving shareholder disputes without resort to litigation, and a decision whether or not to take action on behalf of a company in a derivative action involves the consideration of numerous factors

55

other than potential liability of individual directors.  <u>See</u>
<u>Janssen</u>, 662 N.W.2d at 883.

Further, the alleged wrongdoing by the directors on the
Patterson Board does not rise to the level of "patently egregious"
conduct that might render demand per se futile.  <u>Reimel</u>, 9 F. Supp.
2d at 1066.  Other than the insider trading allegations, all the
breach of fiduciary duty claims are premised upon inaction and the
failure of the Patterson Board to engage in oversight or cure the
conveyance of "false and misleading" information.  Only two of the
directors, Frechette and Wiltz, are directly alleged to have made
a false or misleading statement, and only Frechette and Ezerski are
alleged to have engaged in insider trading.  Had a demand been made
on the Patterson Board, it is not plain from the circumstances that
a majority of the board would not have taken action to cure any
inaccurate or improper information being disclosed to the investing
public.  Neither does the mere sale of stock during the relevant
time period by Frechette and Ezerski suffice to establish demand
futility.

Although Cadd identifies reasons as to why demand may have
been futile as to certain individual or groups of directors, the
allegations considered collectively do not establish demand would
have been futile.  Other than the allegations relating to service
on the audit or compensation committees, Cadd's allegations relate
to at most only two directors.  Upon a review of the allegations,

56

Cadd has not established that the Patterson Board was so conflicted that there existed no possibility that it would respond to a demand or that any such response would have been preordained.  Moreover, although Cadd pleads a conspiracy theory that defendants, each aiding and abetting the other, conspired to deceive the investing public, artificially inflate the price of Patterson common stock and maintain their "profits, power and prestige," the conclusory conspiratorial allegations do not state with particularity that a majority of the board acted in concert or that demand would have been futile under the circumstances of this case.  Cf. Xcel, 222 F.R.D. at 607 (rejecting repetitive, conclusory allegations of knowledge, acquiescence and board authorization to excuse demand).

Assuming Cadd's allegations to be true, as the court must, plaintiff has not established "it was plain under the circumstances" that a pre-suit demand on the Patterson Board would have been futile.  Therefore, the court grants defendants' motion to dismiss and dismisses the verified amended shareholder derivative complaint without prejudice.

## IV.  ERISA Class Action

On March 31, 2006, Dolliver filed the amended putative class action complaint pursuant to 29 U.S.C. § 1132(a)(2) and (3) for violations of ERISA, all of which are premised upon allegations of mismanagement of the Patterson Companies, Inc., Retirement Savings Plan and Employee Stock Ownership Plan ("ESOP") (the "Patterson

Plan").[6]  Dolliver alleges that each ERISA defendant is a fiduciary of the Patterson Plan, as defined by 29 U.S.C. § 1002(21)(A), who breached their respective fiduciary duties during the putative class period.  See 29 U.S.C. § 1104(a).  At the time Dolliver filed the original class action complaint on October 11, 2005, she was a participant in the Patterson Plan.  However, on January 18, 2005, Dolliver terminated her employment with Patterson and on November 7, 2005, she cashed out all of her assets in the Patterson Plan. (See Fitzpatrick Decl. ¶¶ 3-4.)  The Patterson Plan is funded through employer contributions, in the form of cash or employer stock, and is designed to invest "primarily" in qualifying employer securities.  (Loper Aff. Ex. B. §§ 1.2, 4.1, 4.2.)  Patterson is the plan administrator of the Patterson Plan.

Dolliver alleges that the ERISA defendants violated their fiduciary duties by allowing the Patterson Plan to maintain investments in Patterson securities while certain defendants sold in excess of $46 million in personal holdings.  (See Am. Compl. ¶¶ 8-17, 93-166.)  According to Dolliver, defendants knew an undisclosed financial situation of Patterson and, as a result,

---

[6]    Although the amended complaint refers to the "Patterson Companies, Inc., Retirement Savings Plan and ESOP," the company has two distinct plans: the Patterson Companies, Inc., 401(k) Plan and the Patterson Companies Inc., Employee Stock Ownership Plan. (Compare Am. Compl. ¶ 46 with Fitzpatrick Decl. Exs. A, B.) Patterson stock has never been an investment option under the Patterson 401(k) plan; only the Patterson ESOP held Patterson securities during the putative class period.  (See Fitzpatrick Decl. ¶ 2, Ex. A.)

violated their fiduciary duties to invest Patterson Plan funds prudently and solely in the interests of the plan and its participants.   Dolliver alleges that defendants publicly touted Patterson's business prospects, but failed to disclose: a decline in sales of dental services, dental consumables and Canadian dental equipment; an increase in incentive based compensation and salary expenses; and that the company's fourth quarter 2005 earnings projection was grossly inflated as a result of ineffective integration of divergent acquisitions.   (Id. ¶¶ 20-29.)   The alleged fiduciary breaches are predicated on the same statements that form the basis for the securities fraud action — the second and third quarter 2005 earnings press releases and earnings conference calls and statements made during the March 30 and May 6 investor conferences. (Id. ¶¶ 66-80.)

Dolliver claims that the Patterson Plan, its participants and its beneficiaries were injured when the price of Patterson common stock dropped following disclosure of the company's fourth quarter and fiscal year 2005 earnings.   (Id. ¶¶ 81-92.)   As a result, Dolliver alleges that plan participants lost substantial portions of retirement savings and the Patterson Plan failed to achieve gains it would have otherwise realized had the defendants performed their fiduciary obligations.   Dolliver asserts claims for individual liability against defendants under 29 U.S.C. § 1109, co-fiduciary liability under 29 U.S.C. § 1105(a) and non-fiduciary

liability under 29 U.S.C. § 1132(a)(3).  (<u>Id.</u> ¶¶ 62-63, 166.)
Dolliver seeks relief in the form of actual damages in the amount
of losses to the Patterson Plan that resulted from the alleged
fiduciary duty breaches pursuant to 29 U.S.C. § 1109(a), injunctive
and equitable relief pursuant to 29 U.S.C. §§ 1109(a) and
1132(a)(2-3) and costs and attorneys fees pursuant to 29 U.S.C.
§ 1132(g).  (<u>Id.</u> ¶ 171.)  In the prayer for relief, Dolliver seeks
imposition of a constructive trust on the amounts defendants were
unjustly enriched at the expense of the Patterson Plan and an order
that actual damages incurred by the Patterson Plan be allocated
among the individual accounts of the participants that invested in
Patterson common stock in proportion to the accounts' losses
"attributable to the decline in the price of Patterson common
stock."  (<u>Id.</u> at 66.)

Defendants now move to dismiss, or in the alternative for
summary judgment on, all claims because Dolliver lacks standing to
pursue the ERISA claims on behalf of the Patterson Plan.
Alternatively, defendants argue that the Patterson Plan is exempt
from ERISA's diversification requirements and therefore dismissal
of the ERISA action is warranted.

**A.  Standing**

Defendants argue that Dolliver divested herself of standing to
file the amended complaint or pursue this litigation on behalf of
the Patterson Plan when she ceased being an employee of Patterson

60

and withdrew all funds from her ESOP account.  Consistent with
fundamental principles of Article III, defendants argue plaintiff
lacks standing to sue under ERISA, which authorizes commencement of
a civil enforcement action by a "participant," "beneficiary" or
"fiduciary."  <u>See</u> 29 U.S.C. § 1132(a).  Dolliver argues that
(1) because she was a "participant" on the date she filed the
original complaint she retains standing to pursue this litigation
and (2) she meets the criteria established by the Supreme Court in
<u>Firestone Tire Rubber Co. v. Bruch</u>, 489 U.S. 101 (1989), to
commence an ERISA action as a former employee.

First, the parties conflate the issues of Article III standing
and statutory standing, defendants arguing Dolliver has neither and
plaintiff arguing she has both.  <u>See</u> <u>United States v. One Lincoln
Navigator 1998</u>, 328 F.3d 1011, 1014 (8th Cir. 2003) (distinction
between Article III and statutory standing).  To satisfy notions of
Article III standing, a plaintiff must demonstrate an "injury in
fact" that deserves the protection of the relevant federal statute
or constitutional provision invoked.[7]  <u>Minn. Fed'n of Teachers v.
Randall</u>, 891 F.2d 1354, 1356 (8th Cir. 1989).  Stated differently,

---

[7]  To establish Article III standing, a plaintiff has the
burden to demonstrate that he or she suffered an injury in fact, a
causal relationship between the injury and the challenged conduct
and that the injury will likely be redressed by a favorable
decision.  <u>Steger v. Franco, Inc.</u>, 228 F.3d 889, 892 (8th Cir.
2000) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61
(1992)).

the "injury" required by Article III "may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." Lujan v. Defenders of Wildlife, 504 U.S. 555, 578 (1992) (internal quotations omitted).

The gravamen of the parties' dispute is whether Dolliver is a "participant" for purposes of 29 U.S.C. § 1132 so as to entitle her to commence a civil enforcement action under ERISA. Defendants challenge plaintiff's status under ERISA and whether she is the type of individual Congress intended to pursue litigation on behalf of the Patterson Plan, a challenge qualitatively distinct from a jurisdictional challenge to the court's Article III power to hear a "case or controversy." U.S. Const. art. III, § 2. The court concludes that whether the claimed injuries suffered by the Patterson Plan can be pursued by Dolliver, and thereby redressable under ERISA, is best resolved by an analysis of the governing statute and not generalized notions of Article III standing or redressability. See Coan v. Kaufman, 457 F.3d 250, 256 (2d Cir. 2006) (noting "participant" under ERISA is a statutory requirement and not a constitutional question of Article III standing); Moore v. Lafayette Life Ins. Co., 458 F.3d 416, 444-45 (6th Cir. 2006). A determination on the merits of whether plaintiff is a "participant" does not strip the court of its jurisdiction to hear this case or alter the justiciable nature of the parties' controversy. Cf. Arbaugh v. Y&H Corp., 546 U.S. 500 (2006);

Kontrick v. Ryan, 540 U.S. 443, 455-56 (2004); Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 89 (1998); Bell v. Hood, 327 U.S. 678, 681-82 (1946).

Second, Dolliver argues the court's standing analysis ought to be confined to the facts as of the date the original complaint was filed, when it is undisputed that she was a participant of the Patterson Plan, rather than at the time she filed the amended complaint. The court disagrees. It "is well-established that an amended complaint supercedes an original complaint and renders the original complaint without legal effect." In re Atlas Van Lines, Inc., 209 F.3d 1064, 1067 (8th Cir. 2000). Although the court determines the issue of standing based upon the facts at the time of a lawsuit's commencement, the date the amended complaint was filed in this action is the relevant date. See Harley v. Zoesch, 413 F.3d 866, 872 (8th Cir. 2005) (citing Steger v. Franco, Inc., 228 F.3d 889, 892 (8th Cir. 2000) and referencing the date plan participants filed amended complaint in addressing standing); In re AEP ERISA Litig., 437 F. Supp. 2d 750, 757 (S.D. Ohio 2006) (rejecting argument that plaintiff need only be plan participant as of the date the complaint was filed). The issue before the court is whether Dolliver maintained standing to sue upon her complete divestment of plan holdings. The court rejects plaintiff's contention that she need only have possessed statutory standing as of the date the original complaint was filed.

### B.   "Participant"

Under ERISA, a "participant" is defined as "any employee or former employee of an employer ... who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer."  29 U.S.C. § 1002(7).  As construed by the Supreme Court, the term "participant" is naturally read to include "former employees who 'have a reasonable expectation of returning to covered employment' or who have 'a colorable claim' to vested benefits." Firestone Tire Rubber Co. v. Bruch, 489 U.S. 101, 117 (1989) (quoting Kuntz v. Reese, 785 F.2d 1410, 1411 (9th Cir. 1986)).  To establish that a claimant "may become eligible" for benefits, he or she "must have a colorable claim that (1) he [or she] will prevail in a suit for benefits, or that (2) eligibility requirements will be fulfilled in the future." Id. at 117-18.  Because Dolliver does not contend that she is a current employee or has a reasonable expectation of returning to employment with Patterson, her standing to sue is dependent upon whether she has a "colorable claim to vested benefits."

In Adamson v. Armco, the Eighth Circuit held that plaintiffs lacked statutory standing to sue under ERISA for breach of the fiduciary duties imposed under § 404(a) and § 405 because their claims for benefits were time-barred by the applicable statute of limitations.   See 44 F.3d 650, 654-55 (8th Cir. 1995).  In addressing the issue of standing, the Eighth Circuit reasoned the

fact that plaintiffs "were plan participants in the past is irrelevant." Id. at 654.  "'The statute by its terms does not permit a civil action by someone who was a participant at the time of the alleged ERISA violation.  Rather, it is written in the present tense, indicating that current participant status is the relevant test.'"[8]  Id. (quoting Raymond v. Mobil Oil Corp., 983 F.2d 1528, 1534-35 (10th Cir. 1993) (emphasis in original)). Section 1132(a)(2) "does not authorize relief except for the plan itself" and § 1132(a)(3) only "only authorizes traditional equitable relief, not compensatory damages." Id. at 654.

Although the Eighth Circuit has recognized an exception to the "current participant" requirement in cases where the employee or former employee would have been a plan participant "but for" the alleged misconduct or fiduciary breach, that exception applies only if the alleged breach of fiduciary duty deprived the plaintiff of participant status.  Id. at 654-55 (collecting cases).  Such an exception "does not apply to claimants whose loss of participant status resulted from their own actions." Id.  In Adamson, the plaintiffs "lost their participant status when they allowed their

---

[8]  Had Congress intended that former plan participants have standing to sue under 29 U.S.C. § 1132(a)(2) or (3), it could easily have clarified such an intent.  Compare 29 U.S.C. § 1132(a)(2) ("by the Secretary, or by a participant, beneficiary or fiduciary") and (a)(3) ("by a participant, beneficiary or fiduciary") with 29 U.S.C. § 1132(a)(9) ("by the Secretary, by any individual who was a participant or beneficiary at the time of the alleged violation, or by a fiduciary") (emphasis added).

benefit claims to become time-barred.  A person who gives up participant status through inaction also relinquishes standing to complain of prior plan mismanagement." Id.

In Gilquist v. Becklin, this court rejected that a plaintiff could be deemed a plan "participant" if he or she previously received a lump-sum payment of all vested benefits because, presuming plaintiff's success, the result would be a damages award and not an increase in vested benefits.  675 F. Supp. 1168, 1170-71 (D. Minn. 1987), aff'd mem., 871 F.2d 1093 (8th Cir. 1988). Although Gilquist pre-dates the Supreme Court's holding in Bruch, the Eighth Circuit Court of Appeals has recognized the Gilquist holding to be consistent with post-Bruch case law. See Adamson, 44 F.3d at 655.  Analogously, in holding that a damages claim for breach of a fiduciary duty is insufficient to confer "beneficiary" status for purposes of statutory standing under ERISA, this court has recognized a distinction between "a person seeking to recover benefits under the terms of a plan, [who] thus has standing, and a person merely seeking damages outside the terms of a plan, [who] thus lacks standing." Zinn v. Donaldson Co., Inc., 799 F. Supp. 69, 74 (D. Minn. 1992).

In a case factually similar to the instant action, the First Circuit determined that "[a]lthough plaintiff may have had standing as a current employee when he brought this action, by the time he filed his amended complaint, he lost this standing on account of

having terminated his employment with [his employer] and having collected all vested benefits then due him from the ESOP." Crawford v. Lamantia, 34 F.3d 28, 32 (1st Cir. 1994). Other circuit courts of appeals have also declined to recognize former employees as plan "participants" once they have effectively terminated all rights under the plan. See, e.g., Teagardener v. Republic-Franklin Inc. Pension Plan, 909 F.2d 947 (6th Cir. 1990); Kuntz v. Reese, 785 F.2d 1410, 1411-12 (9th Cir. 1986), abrogated by statute on other grounds, as noted in Kayes v. Pac. Lumber Co., 51 F.3d 1449, 1455 (9th Cir. 1995); Joseph v. New Orleans Elect. Pension and Ret. Plan, 754 F.2d 628, 630 (5th Cir. 1985); see also Morrison v. Marsh & McLennan Cos., 439 F.3d 295, 303-04 (6th Cir. 2006).

In arguing that she has standing, plaintiff relies heavily on the Fifth Circuit decision in Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan to support her argument that she is a "participant" because she seeks "benefits" under the Patterson Plan. See 883 F.2d 345, 350 (5th Cir. 1989). However, the relief sought by Dolliver in this action is distinguishable. The class in Sommers argued that they did not receive the full amount of their vested benefits because the company sold the shares at less than fair market value in connection with a planned liquidation of the trust. Id. The Fifth Circuit agreed, holding that the class had a claim for an "ascertainable amount" because it was plain that

they sought the difference between "the price the representatives received for their shares and the fair market value of those shares at the time they were sold." Id.

Applying the Bruch test in this case, and assuming for argument's sake that plaintiff's claims are colorable, the dispositive inquiry is whether those claims are for "vested benefits." They are not. Unlike in Sommers, Dolliver does not seek a readily ascertainable amount, but a jury determination on the difference between the value of Patterson common stock following its drop in price and the money the Patterson Plan could have earned had it transferred its assets into other more profitable investment options. Not only are the damages not readily ascertainable, a drastic transfer of a substantial portion of the Patterson Plan's assets from Patterson common stock into alternative investments would have been in contravention of the very purpose of the ESOP, which was to primarily invest in Patterson securities.

Dolliver terminated her employment with Patterson and cashed out her assets of her own volition. Having divested herself of all plan holdings, she has collected the vested benefits owed to her under the Patterson Plan and does not assert any persuasive argument to the contrary. To the extent Dolliver seeks recourse for the purported lost value of her individual account, she does not have standing to pursue such relief through an ERISA civil

enforcement action on behalf of the Patterson Plan.  Illustrative is plaintiff's own prayer for relief, which seeks equitable relief and an allocation of the Patterson Plan's actual damages to the participants' accounts.  No longer having an account, plaintiff does not stand to benefit from injunctive relief and does not have an account to which her portion of the damages could be allocated.

Plaintiff focuses the court's attention on her request for imposition of an equitable "constructive trust," emphasizing the broad remedial purpose of ERISA.  However, an equitable demand for relief does not alter the court's conclusion that Dolliver is not a "current participant" of the Patterson Plan.  Adamson, 44 F.3d at 654.  The court will not conflate the remedial nature of ERISA and the issue of statutory standing.  Having obtained all benefits Dolliver is entitled to under the Patterson Plan, her claim is one for damages and not "vested benefits."  Accordingly, Dolliver is not a plan "participant" and does not have standing to pursue this litigation under 29 U.S.C. § 1132 on behalf of the Patterson Plan. Cf. AEP ERISA Litig., 437 F. Supp. 2d 750, 757 (S.D. Ohio 2006); LaLonde v. Textron, Inc., 418 F. Supp. 2d 16, 22 (D.R.I. 2006); Hargrave v. TXU Corp., 392 F. Supp. 2d 785, 789 (N.D. Tx. 2005). Therefore, the court grants defendants' motion to dismiss and dismisses the amended class action complaint for violations for ERISA with prejudice.  Because Dolliver does not have standing, the

court declines to reach the merits of whether the Patterson Plan is exempt from ERISA's diversification requirements.

## CONCLUSION

Therefore, **IT IS HEREBY ORDERED** that:

1.    Defendants' motion to dismiss the consolidated class action securities complaint [Doc. No. 58 in 05cv1757] is granted;

2.    The consolidated securities class action complaint [Doc. No. 54 in 05cv1757] is dismissed with prejudice;

3.    Defendants' motion to dismiss the amended ERISA class action complaint [Doc. No. 17 in 05cv2383] is granted;

4.    The amended ERISA class action complaint [Doc. No. 55 in 05cv1757] is dismissed with prejudice;

5.    Defendants' motion to dismiss the amended shareholder derivative class action [Doc. No. 32 in 05cv2155] is granted;

6.    The amended shareholder derivative complaint [Doc. No. 28 in 05cv2155] is dismissed without prejudice;

7.    Defendant's motion to strike Exhibits 2, 4 and 9 [Doc. No. 88 in 05cv1757] is denied as moot.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  March 20, 2007

s/David S. Doty                
David S. Doty, Judge
United States District Court

70